**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**UNITED STATES OF AMERICA**

**vs.** **Case No: 5:22-72-GAP-PRL**

**DAVID ROBINSON, JR.**

---

# MOTION TO DISMISS INDICTMENT AND MEMORANDUM OF LAW

The Defendant, DAVID ROBINSON, JR, by and through the undersigned attorney, moves this Court under Rules 12(b)(2), (3)(iii) and (v), Federal Rules of Criminal Procedure, to dismiss the indictment for lack of jurisdiction, lack of specificity, and failure to state offenses.

Mr. Robinson contends that the statutes violate the Second, Fifth, Eighth, and Tenth Amendments to the United States Constitution.

In support of this Motion, Mr. Robinson states:

1. Mr. Robinson is charged in a one-count indictment. The Indictment states that Mr. Robinson "did knowingly possess a firearm as defined under 26 U.S.C. § 5845(a), that is: a rifle having a barrel less than 16 inches in length, which was not then registered to the defendant in the National Firearms Registration and Transfer Record." The Indictment cites 26 U.S.C. §§ 5841, 5861(d) & 5871.

2. Mr. Robinson moves to dismiss this Indictment because:

a) The statute and offense violate Mr. Robinson's right to keep and bear arms under the Second Amendment.

b) Federal criminal punishment of the possession of an unregistered firearm under 26 U.S.C. §§ 5861(d) and 5871 exceeds Congress's power to tax under Article I, section 8, of the Constitution and violates the Tenth Amendment. The NFA is unconstitutional, both on its face and as applied to Mr. Robinson.

c) If the Act is a tax, it is unconstitutional because it taxes the exercise of Second Amendment rights.

d) The offense charged is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

## MEMORANDUM OF LAW

### I. The NFA violates the Second Amendment.

The Second Amendment protects an individual's right to keep and bear arms for self-defense, both in the home and in public. *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2125 (2022). *Bruen* marks a dramatic shift in Second Amendment law. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement

on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only "constitutional text and history." 142 S. Ct. at 2126, 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must affirmatively prove that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.; see id.* at 2127 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

Here, the plain text of the Second Amendment covers Mr. Robinson's conduct of possessing a short-barreled rifle, and his conduct is presumptively protected by the Second Amendment under *Bruen*. The government must show that § 5861 is consistent with the Nation's historical tradition of firearm regulation. But the NFA is a twentieth-century innovation that burdens constitutionally protected conduct. Regulations did not exist during the founding era that taxed and registered short-barreled arms and criminalized the possession of unregistered short-barreled arms. As discussed *infra*, such regulations have no historical analogue. Because the government cannot meet its burden to prove these regulations are consistent with the Nation's historical

tradition of firearms regulation, this Court should dismiss the indictment as violating the Second Amendment.

**A. Mr. Robinson's conduct—possessing a firearm—is presumptively protected by the Second Amendment.**

To determine whether a government regulation implicates the Second Amendment, *Bruen* asks whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is easy in this case. The Second Amendment protects the right of the people to "keep and bear arms." The conduct proscribed by § 5861(d) here---possession of a firearm—easily qualifies as "keep[ing]" and "bear[ing]" arms. *See District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008) (holding statute that barred possession of handguns in the home unconstitutional). And the statute applies to everyone, including Mr. Robinson, necessarily impacting "the right of the people." Because the Second Amendment's plain text covers the conduct at issue in § 5861(d), the Constitution presumptively protects that conduct.

**B. The *Bruen* framework centers Second Amendment analysis on the public understanding of the text at the time of its adoption.**

In *Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to keep and bear arms. 554 U.S. at 595. The "central holding" of *Heller*, the Court later explained, was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most

notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

Following *Heller* and *McDonald*, the Eleventh Circuit followed a two-step inquiry for deciding Second Amendment challenges. That test required courts to determine (1) if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we . . . apply the appropriate level of scrutiny." *United States v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020) (citing *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017)). The Supreme Court's recent *Bruen* opinion, however, rejected that approach. 142 S. Ct. at 2126. Instead of balancing means and ends, *Bruen* instructed lower courts to focus solely on "constitutional text and history." 142 S. Ct. at 2128-29. As such, this Court must carefully examine the NFA under *Bruen*'s originalist framework, conducting a fresh look at the NFA through the lens of the Second Amendment's text, history, and tradition.

Under that framework, the Second Amendment is "widely understood" to have codified a pre-existing right, the bounds of which are determined according to "*the public understanding* of [the text] in the period after its enactment or ratification." *Bruen*, 142 S. Ct. at 2128. Its adoption "is the very *product* of an interest balancing by the people" and "[i]t is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.* at 2131.

While the *Bruen* decision does not purport to undertake a comprehensive historical analysis, it does set out several useful guideposts for courts to follow:

1. The relevant historical record is the founding era when the Second Amendment was adopted in 1791, and potentially when the Fourteenth Amendment incorporated the Bill of Rights with respect to the States in 1868. *Id.* at 2136.

2. The *Bruen* framework places the burden affirmatively on the government. *Id.* at 2150.

3. The analysis should be "fairly straightforward" with respect to regulations that address general societal problems that have existed since the 18th century. *Id.* at 2131.

4. When presented with "unprecedented societal concerns or dramatic technological changes," courts must employ analogical reasoning, considering whether the modern regulation and its historical analogues "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

5. The Court cautioned against defining the relevant unit of comparison too broadly. *Id.* at 2133-34.

Applying this framework, there is no basis in the Nation's history and tradition to uphold § 5861(d).

### C. There is no historical analogue for taxing and registering short-barreled firearms, nor for criminalizing failure to comply with taxation and registration requirements.

In 1934, Congress enacted the National Firearms Act (NFA), which imposed taxes and registration requirements on certain firearms, as defined by the statute. In 1948, Congress added the provision criminalizing the

possession of unregistered firearms. *See* Pub. L. 85-859, Title II, § 203(i)(1), 72 Stat. 1428 (Sept. 2, 1958).

Now, the NFA imposes stiff criminal penalties on anyone who possesses a short-barreled rifle that is not registered in the National Firearms Registration and Transfer Record. *See* 26 U.S.C. § 5845(a) (defining "firearm"), 5861(d) (prohibiting receipt or possession of an unregistered firearm), 5871 (providing for penalties of $10,000 and ten-years imprisonment). But the NFA covers arms that are in common use.

**1. Short-barreled arms were common during the founding era and remain common today.**

Under *Bruen*, the Second Amendment applies to "arms in existence in the 18th century" and to "modern instruments that facilitate armed self-defense." 142 S. Ct. at 2132. While regulation of short-barreled firearms is relatively new, dating only to the passage of the NFA in 1934, the existence of short-barreled weapons is not. *See* James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 508 (2017) ("Short-barrel firearms, unlike modern 'assault weapons,' *did* exist at the time of the Second Amendment's drafting and ratification."). Various versions of the blunderbuss, firearms "boasting very short barrels, were popular for self-defense and occasionally used by militaries." *Id.* at 503.

In addition, "[b]ecause of their size and tactical maneuverability, short-barrel firearms are ideal for self-defense." *Id.* at 512. Like handguns, short-barrel firearms are well-suited to self-defense, in the home or in public.[1] And "short-barreled rifles and shotguns have become increasingly popular for home defense and defensive-skills-based marksmanship training and competitions . . . ." (See NRA-ILA website, https://www.nraila.org/get-the-facts/national-firearms-act-nfa/, last accessed August 9, 2022). The only reason they are not more popular for self-defense is because they are heavily, slowly, and unconstitutionally regulated.

Under *Bruen* and *Heller*, "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). By contrast, the Second Amendment does not protect "dangerous and unusual weapons." *Id.* Short-barrel shotguns are no more dangerous or unusual than the handguns protected by *Bruen* and *Heller*. There is no basis to exclude these arms from the protection of the Second Amendment.

[1] Currently, 162, 267 short-barreled shotguns are registered with the federal government. *See* Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (Ex. 8), available at https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed Sept. 15, 2022).

And there is no basis to criminalize their possession. In *Johnson v. United States*, 576 U.S. 501 (2015), the Court had to decide whether a prior conviction for possession of a short-barreled shotgun qualified as a violent felony under the Armed Career Criminal Act (18 U.S.C. §924(e)). In his concurrence, Justice Thomas addressed the conduct of Mr. Johnson's prior conviction. He noted the government's argument that although the unlawful possession of a short-barreled shotgun can occur in a nondangerous manner, "the Government contends that this offense poses a serious risk of physical injury due to the connection between short-barreled shotguns and other serious crimes." The Government argued that such firearms are "weapons not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, but are instead primarily intended for use in criminal activity. Justice Thomas answered that the danger presented by a short-barreled shotgun was then not its mere possession, but its use (especially its use in other criminal activity). *Id.* at 610.

Likewise, the Eleventh Circuit had previously held in *United States v. McGill*, 618 F.3d 1273 (11th Cir. 2010), that a prior conviction for possessing a short-barreled shotgun was not a violent felony under the ACCA. It did so by analyzing whether the conduct (possession of a certain type of firearm) presented a serious risk of injury to another. It concluded that the conduct did not present the requisite dangerousness.

Here the statute charges the mere possession of this class of weapons.

"The fact remains that there is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610 (1994). Guns in general are not "deleterious devices or products or obnoxious waste materials," that put their owners on notice that they stand "in responsible relation to a public danger." *Id.* at 611 (cleaned up). "Despite their potential for harm, guns generally can be owned in perfect innocence." *Staples* was a statutory construction case addressing the *mens rea* requirement for conviction of possession of a machinegun: whether the defendant had to know the character of the firearm making it subject to registration. *Id.* at 604. The Court concluded that the government was required to prove such knowledge. *Id.* at 619.

In dicta, the Court addressed the government's assumption that the fact that something was dangerous in the general sense made its possession not also entirely innocent. *Id.* at 611. The Court said that it might classify certain categories of guns, "including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation" as items which would have the same quasi-suspect character attributed to owning hand grenades in *Freed*. *Id.* at 611-612. However, Staples did not address the Second Amendment claim.

And short-barreled shotguns are rarely used in crimes. For example, in January 2019, the U.S. Department of Justice published a special report entitled "Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016." Based on the 2016 Survey of Prison Inmates (SPI), about 1 in 5 (21%) of all state and federal prisoners reported that they had possessed or carried a firearm when they committed the offense for which they were serving time in prison. *Id*. at page 1. Of the inmates reporting possessing or using a firearm during their crime, only 1.6% of inmates reported possessing a shotgun and 1.1 percent reported using a shotgun. *Id*. at page 5. This survey includes all shotguns, whether standard or short barreled, and shows that such long guns are rarely possessed or used in crimes.

Likewise, in a 2020 report produced by the State of California Division of Law Enforcement, Bureau of Forensic Service entitled "2020 Firearms Used in the Commission of Crimes,"[2] the State reported statistics of ten regional crime labs (largely covering the more rural parts of the state) regarding the type and caliber of firearms used in crimes. The report concluded that of the 48 firearms used in crimes of violence other than homicides, there were 45 handguns and 3 were rifles. Of the firearms used in homicides, there were 30

[2] This report is available online at http://oag.ca.gov/publications#crime.

handguns, 1 rifle and 3 shotguns. *Id* at page 3. None of the examined firearms were classified as short-barreled. *Id* at page 5.

Finally, to the extent this inquiry requires a factual determination, Mr. Robinson respectfully requests an evidentiary hearing on this issue.

**2. Regulating short-barreled shotguns and rifles burdens rights protected by the Second Amendment and has no historical basis.**

Even though the NFA does not outright ban short-barreled shotguns, it imposes unconstitutional burdens on the people. The registration requirements, for example, can entail "wait times of several months to a year." D'Cruz, 40 Harv. J.L. & Pub. Pol'y at 511. And the Supreme Court has made clear that the Constitution prohibits the government from imposing even de minimus burdens on fundamental rights. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008); *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592-93 (1983). As the Court observed in *Minneapolis Star*, the power to single out certain conduct for taxation "gives a government a powerful weapon against the taxpayer selected." 460 U.S. at 585. And Justice Kavanaugh has suggested that "registration of all lawfully possessed guns is not permissible under the Second Amendment." *Heller v. District of Columbia*, 670 F.3d 1244, 1293 (D. C. Cir. 2011) (Kavanaugh, J., dissenting). The *Bruen* case itself did not involve an outright ban, but a licensing scheme that required an application to

demonstrate a special need for self-defense in order to carry handguns publicly. 142 S. Ct. at 2122. Like other regulations that burden constitutional rights, therefore, the restrictions on owning short-barreled firearms must pass *Bruen*'s historical test.

The burden is on the government to prove that the restrictions imposed by the NFA are historically based. It cannot do so. The statute is unconstitutional.

**3. *United States v. Miller* does not require a different result.**

Shortly after the passage of the NFA, the Supreme Court decided *Miller*, upholding the constitutionality of the NFA as applied to short-barreled shotguns. 307 U.S. 174, 178 (1939). The case has been criticized on numerous grounds. The Court decided the case without hearing from the defendants, whose lawyer did not submit briefing or appear for oral argument. *See* Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J. of L. & Liberty, 48, 66-67 (2008). The opinion is "quite terse," "consists primarily of lengthy quotations and string cites," and is "anchored by a few paragraphs of crabbed analysis." *Id.* Instead of examining the historical records, the Court relied on "the absence of any evidence" showing that short-barreled shotguns were useful defensive weapons, and claiming that such evidence was "not within judicial notice." *Miller*, 307 U.S. at 178.

And in *Heller*, the Supreme Court cautioned: "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 621. Indeed, the *Heller* decision cautions against "erroneous reliance upon" *Miller*, explaining "an uncontested and virtually unreasoned case cannot nullify the reliance millions of Americans (as our historical analysis has shown) upon the true meaning of the right to keep and bear arms." *Id.* at 624 n.24. Perhaps most of all, *Miller* focused on the militia, but *Heller* and *Bruen* explained that the Second Amendment is an individual right which covers arms used for self-defense.[3]

In sum, this Court needs to evaluate § 5861(d) anew, in light of *Bruen*, relying on *Bruen*'s originalist framework, examining this Nation's history and tradition of firearms regulation, and find that the taxation, registration, and criminalization of failure to do so is not part of that history and tradition.

## II. The NFA exceeds taxing authority and violates 10th Amendment.

Every federal criminal penalty must be grounded in one of Congress's enumerated powers. *Bond v. United States*, 572 U.S. 844, 854 (2014); *Bolatete*,

[3] And although the Court in *Heller* stated that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law abiding citizens for lawful purposes, such as short-barreled shotguns," 554 U.S. at 625, *Bruen* requires reevaluation of that interpretation, especially in light of the fact that short-barreled shotguns are not easily available due to heavy regulation restrictions.

977 F.3d at 1031.[4] The Eleventh Circuit has held that the NFA, and the criminal penalty for violating it, are grounded in Congress's power to tax. *Bolatete*, 977 F.3d at 1031.

Mr. Robinson respectfully maintains that the NFA in general, and 26 U.S.C. § 5861(d) in particular, are unconstitutional both facially and as applied because they exceed Congress's power to tax.[5] However, Mr. Robinson recognizes that the Eleventh Circuit has rejected this argument. *Bolatete*, 977 F.3d at 1034-35. But *Bolatete* was decided before *Bruen,* and Mr. Robinson argues the following to preserve the issue for further review.

**A. The NFA's transfer "tax" and "attendant regulations"**

The NFA requires that any person who transfers a qualifying firearm to someone else must pay a $200 transfer tax and register the firearm to the transferee. *See* 26 U.S.C. §§ 5811(a), 5841; *see also Bolatete*, 977 F.3d at 1031.[6] It is the transferor, not the transferee, who is obligated to pay the tax and register the firearm. *See* 26 U.S.C. §§ 5811(b), 5841(b); *see also Bolatete*, 977

---

[4] Congress lacks a general police power that would allow it to "punish felonies generally." *Bond*, 572 U.S. at 854 (quoting *Cohens v. Virginia*, 6 Wheat. 264, 428, 5 L.Ed. 257 (1821)). In contrast, the "States have broad authority to enact legislation for the public good" and punish local criminal activity. *Id*. at 854, 858 (citing *United States v. Morrison*, 529 U.S. 598, 618 (2000)); *see also Nat'l Fed. Of Ind. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 535-36 (2012) (punishment of street crime, often called the "police power" is a general power possessed by the States but not the Federal Government); *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) ("States possess primary authority for defining and enforcing the criminal law.").

[5] Because the NFA exceeds Congress's power to tax, the NFA also violates the Tenth Amendment. *See* U.S. Const., Amend. X.

[6] The transfer tax is only $5 for firearms classified as "any other weapon" under 26 U.S.C. § 5845(e). *See* 26 U.S.C. § 5811(a); *see also Bolatete*, 977 F.3d at 1031, n.3.

F.3d at 1031. An "attendant regulation" criminalizes the possession of an unregistered firearm and punishes the offense by ten years in prison and a $10,000 fine. *Bolatete*, 977 F.3d at 1032; *see* 26 U.S.C. §§ 5861(d), 5871. Mr. Robinson has been criminally charged with violating the "attendant regulation" in § 5861(d). Doc. 1.

In *Bolatete*, the court held that it was bound by *United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972), and *United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009), to uphold the constitutionality of the NFA as a valid exercise of Congress's power to tax. 977 F.3d at 1032-34. In *Ross*, the court held that the penalty imposed by § 5861(d) on possessors of certain unregistered firearms is a valid exercise of the taxing power because that penalty "ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax." 458 F.2d at 1033. In *Spoerke*, the court held that "[t]he National Firearms Act is facially constitutional" and that "Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons." 568 F.3d at 1245.

But for purposes of further review, Mr. Robinson respectfully submits that the NFA, its transfer fee, and attendant regulations do not function as a tax and a taxing scheme. Rather, the NFA is "a regulatory measure in the

interest of public safety." *United States v. Freed*, 401 U.S. 601 (1971).[7] As Justice Stevens described the NFA:

> Congress fashioned a legislative scheme to regulate the commerce and possession of certain types of dangerous devices, including specific kinds of weapons, to protect the health and welfare of the citizenry. To enforce this scheme, Congress created criminal penalties for certain acts and omissions.

*Staples,* 511 U.S. at 630 (Stevens, J., dissenting). The $200 transfer fee underlying the NFA serves as a pretext for criminalizing the mere possession of certain firearms. And "[t]here comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." *Nat'l Fed. Of Ind. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 573 (2012) (cleaned up).

**B. The $200 transfer fee does not function as a tax, and the attendant regulations do not aid a revenue purpose.**

Taxes are identified by a "functional approach" that focuses on the "practical characteristics of the so-called tax" and disregards any given label in favor of viewing the "substance and application" of the exaction. *NFIB*, 567 U.S. at 565 (quoting *United States v. Constantine*, 296 U.S. 287, 294 (1935)).

---

[7] *See also Staples,* 511 U.S. at 627 (Stevens, J., dissenting) (the NFA "is primarily a regulatory measure"); *id.* at 630; *see also* National Firearms Act: Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 8 (1934); Rept. No. 1780, Committee on Ways and Means, U.S. House of Representatives, 73rd Cong., 2d Sess. 2 (1934); Rept. No. 1444, Committee on Finance, U.S. Senate, 73rd Cong., 2d Sess. 1 (1934).

In addition, the statutory context of the exaction and its practical operation are relevant to determining whether an exaction is a tax. *See id.* at 563-70. The essential feature of a tax is the production of revenue for the government. *See id.* 563-64. The Eleventh Circuit considers "whether on its face the tax operates as a revenue generating measure and the attendant regulations are in aid of a revenue purpose." *Bolatete*, 977 F.3d at 1032 (quoting *Ross*, 458 F.2d at 1145).

Several practical characteristics of the $200 payment and its attendant regulations strongly suggest that it does not function as a tax. First, the amount of the $200 payment has not changed for inflation since 1934. *See* National Firearms Act, Pub. L. No. 73-474, § 3, 48 Stat. 1236, 1237 (1934); *Bolatete*, 977 F.3d at 1033, n.9. But in 2020, $51,677,000 in transfer and making taxes were paid to the federal government. *See* Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 12 (Ex. 6), available at https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed Sept. 15, 2022).

Second, since 2003, the Justice Department and the Bureau of Alcohol, Tobacco, and Firearms (ATF) are responsible for enforcing the NFA—not the

Treasury Department and its Internal Revenue Service (IRS).[8] *See Bolatete*, 977 F.3d at 1033, n.9. The decision to transfer ATF from the Treasury Department to the Justice Department reflects the domination of the criminal enforcement provision of the statute over revenue collection. Also, enforcement by the Justice Department suggests that the $200 payment does not function as a tax. *See Bailey v. Drexel Furniture*, 259 U.S. 20, 36-37 (1922) (*Drexel Furniture*) (finding that the so-called tax was a penalty in part because it was enforced by the Department of Labor, an agency responsible for punishing violations of labor laws); *see also NFIB*, 567 U.S. at 563-64 (finding that the payment was a tax in part because it was enforced by the IRS, an agency responsible for collecting revenue).

Third, unlike the tax in *NFIB*, the ATF and Justice Department may enforce the payments required by the NFA using "those means most suggestive of a punitive sanction, such as criminal prosecution." *NFIB*, 567 U.S. at 563-64. Indeed, the criminal penalties drive the NFA, not the collection of revenue. Yet the penalty provisions are not "naturally and reasonably adapted to the collection of the tax" but rather to "the achievement of some other purpose

[8] *See* ATF History Timeline, Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/our-history/atf-history-timeline; *see also* Pub. L. No. 107-296, §§ 1111, 1112(k), 116 Stat. 2135, (2002) (creating the Department of Homeland Security); *see also* 6 U.S.C. § 531; 26 U.S.C. § 7801(a)(2).

plainly within state power." *Drexel Furniture*, 259 U.S. at 43. The criminal provisions do not aid a revenue purpose.

Indeed, the NFA criminal penalty is far more severe than other criminal penalties for failing to pay taxes. Failure to obtain a $200 tax stamp on a qualifying firearm carries a maximum penalty of $10,000 and 10 years imprisonment. 26 U.S.C. § 5871. But the maximum penalty for violations of the Internal Revenue Code is only five years imprisonment (26 U.S.C. § 7201), with other violations carrying three-year (26 U.S.C. § 7206) or one-year (26 U.S.C. § 7203) terms.

### C. The NFA is a pretext to exercise a general police power and coerce conduct protected by the Second Amendment.

The taxing power does not give Congress the same degree of control over individual behavior as the current understanding of Congress's power to regulate commerce. *NFIB,* 567 U.S. at 573. Rather, "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." *Id.* at 574. Although Congress may, in certain circumstances, use its taxing power to influence conduct, that ability is not limitless. *Id.* at 572; *see, e.g., Linder v. United States*, 268 U.S. 5 (1925) (stating that Congress may not justify the regulation of the practice of the medical profession under the pretext of raising revenue); *Drexel Furniture*, 259 U.S. at 39-40 (invalidating the "so-called tax" as a "penalty to coerce people of a state

to act as Congress wishes them to act in respect of a matter completely the business of the state government under the federal Constitution").[9]

Critically, "the provisions of the so-called taxing act must be naturally and reasonably adapted to the collection of the tax and not solely to the achievement of some other purpose plainly within state power." *Drexel Furniture*, 259 U.S. at 43. In other words, Congress may not use its enumerated powers as a pretext to exercise power reserved to the States. *Id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 423 (1819)). In particular, Congress may not usurp the police powers of the States under the guise of a taxing act. *See Constantine*, 296 U.S. at 287. And courts must read the Constitution's grant of the power to tax and other powers "carefully to avoid creating a general federal authority akin to the police power." *NFIB*, 567 U.S. at 536. Nearly a century ago, this Court warned of the potential dangers of allowing laws that pretextually use the taxing authority to legislate on matters of public interest reserved to the States.

> Grant the validity of this law, and all that Congress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the states have never parted with, and which are reserved to them by the Tenth Amendment,

[9] To be sure, Congress does not necessarily exceed its constitutional authority when it levies taxes in an effort to influence conduct. *See NFIB*, 567 U.S. at 567 ("taxes that seek to influence conduct are nothing new"); *see also Drexel Furniture*, 259 U.S. at 38, 40-43 (discussing cases); *cf. Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767 (1994) ("We have cautioned against invalidating a tax simply because its enforcement might be oppressive or because the legislature's motive was somehow suspect.").

> would be to enact a detailed measure of complete regulation of the subject and enforce it by a socalled tax upon departures from it. To give such magic to the word 'tax' would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states.

*Drexel Furniture*, 259 U.S. at 38.

For purposes of further review, Mr. Robinson submits that the NFA exceeds Congress's enumerated power to tax and is unconstitutional.

## III. Alternatively, the NFA is an unconstitutional fee or tax on the Second Amendment right to keep and bear arms.

Given that the Eleventh Circuit has held that the NFA's $200 requirement and attendant regulations criminalizing possession of an unregistered firearm are valid exercise of Congress's power to tax, Mr. Robinson argues as an alternative to his preservation argument that the fee impermissibly infringes on his Second Amendment right to possess a firearm. *See NFIB*, 132 S. Ct. at 2598 ("[A]ny tax must still comply with other requirements in the Constitution.").

The government cannot impose a general revenue tax or fee on the exercise of a constitutional right under the First Amendment. *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) (holding that the government "may not impose a charge for the enjoyment of a right granted by the federal constitution"); *see also Cox v. New Hampshire*, 312 U.S. 569, 576-77 (1941). "Under *Murdock* and *Cox*, when core First Amendment freedoms are made

subject to a licensing scheme, only revenue-neutral fees may be imposed so that the government is not charging for the privilege of exercising a constitutional right." *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1314 (11th Cir. 2003). The government bears the burden "to demonstrate that its licensing fee is reasonably related to recoupment of the costs of administering the licensing program." *Id.*

Whether the fee jurisprudence of *Murdock* and *Cox* applies when the government taxes a Second Amendment right is an open question in the Eleventh Circuit. *See Bolatete*, 977 F.3d at 1035.[10] But there is no reason to treat the Second Amendment differently from the First Amendment. *See McDonald,* 561 U.S. at780 (plurality opinion) (stating that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").[11] And before *Bruen*, other circuits imported the *Murdock/Cox* fee jurisprudence to the Second Amendment context. *See Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017) (applying the fee-jurisprudence framework and concluding that fees supporting an extended background-check program "can fairly be considered

---

[10] This argument is not foreclosed by *Bolatete*. Because the issue was not preserved in the district court, the Eleventh Circuit reviewed for plain error and found no controlling precedent directly resolving the issue. *Bolatete*, 977 F.3d at 1035-36.

[11] Although the Supreme Court upheld the NFA tax against a Second Amendment challenge in *Miller*, 307 U.S. at 174, that case did not challenge the NFA tax as a tax on the exercise of a constitutional right. Moreover, the Supreme Court later warned against giving too much weight to the *Miller* decision. *See supra* at 13-14 & n.3.

an expense of policing the activities in question, or an expense incident to the maintenance of public order in the matter licensed" (cleaned up)); *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013) (deciding that "the Supreme Court's First Amendment fee jurisprudence provides the appropriate foundation for addressing" the plaintiffs' challenge to a handgun-licensing fee).

Mr. Robinson maintains that the NFA impermissibly imposes fees, or alternatively taxes, on his Second Amendment right to keep and bear arms. It is the government's burden to demonstrate that the NFA fee is reasonably related to recoupment of the costs of administering the NFA. Because the government cannot do so, the NFA charges fees for the exercise of Second Amendment rights and is unconstitutional.

## IV. The NFA is unconstitutionally vague

The Fifth Amendment provides "[n]o person shall . . . be deprived of life, liberty or property, without due process of law." Under this Due Process Clause, the government may not take away "someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson,* 576 U.S. at 595 (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)); see also *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled

rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Id.* (quoting *Connally v. General Constr. Co.,*, 269 U.S. 385, 391 (1926)).

The void-for-vagueness doctrine requires that a criminal statute define an offense with sufficient clarity that an ordinary person has fair notice of what conduct is prohibited and to avoid arbitrary and discriminatory enforcement. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). The Eleventh Circuit requires consideration of the vagueness of a statute in light of the facts of the particular case (as-applied). *United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004).

After *Johnson*, a defendant need not show that the statute is vague in all of its applications in order to successfully mount a facial challenge. *Johnson*, 135 S. Ct. at 2561; *Cook*, 970 F.3d at 876. *Johnson* also rejected the notion that a statute is saved from a vagueness challenge because the statute undoubtedly reaches some conduct. *Johnson*, 135 S. Ct. at 3561; *Cook*, 970 F.3d at 876.

Mr. Robinson acknowledges the Eleventh Circuit precedent in *Marte,* 356 F.3d at 1342. He respectfully submits that it did not consider Johnson. To the extent the rule announced in *Marte* remains binding, he raises the issue of whether a facial challenge to the vagueness of a statute outside the First Amendment context to preserve it for further review.

DATED: November 21, 2022

A. Fitzgerald Hall, Esq.
Federal Defender – Middle District of Florida

*s/ Christine N. Bird*
Christine N. Bird, Esquire
Fla Bar Number 0971642
203 E. Silver Springs Blvd.
Suite 202
Ocala, FL 34471
Telephone: 352-351-9157
Facsimile: 352-351-9162
Christine_bird@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic notification using the clerk of court's CM/ECF system to Hannah Nowalk, Assistant United States Attorney, this 21st of November, 2022.

*s/ Christine N. Bird*
Assistant Federal Public Defender